# 2007 DTA 125

**TRIBUNAL DE APELACIONES
REGIÓN JUDICIAL DE CAROLINA
PANEL XI**

ÁNGEL PÉREZ DÍAZ, ELBA ROSA CORREA SANTIAGO Y LA SOCIEDAD LEGAL DE BIENES GANANCIALES COMPUESTA POR AMBOS
Querellantes-Apelados

v.

MERCK SHARP & DOHME (I.A) CORP., PUERTO RICO; FULANO DE TAL
Y COMPAÑÍA DE SEGUROS ABC
Querellados-Apelantes

ÁNGEL PÉREZ DÍAZ, ELBA ROSA CORREA SANTIAGO Y LA SOCIEDAD LEGAL
DE BIENES GANANCIALES COMPUESTA POR AMBOS
Querellantes-Apelantes

v.

MERCK SHARP & DOHME (I.A) CORP., PUERTO RICO; FULANO DE TAL
Y COMPAÑÍA DE SEGUROS ABC
Querellados-Apelados

Núms. Cons. KLAN-2006-00873 / KLAN-2006-00910

San Juan, Puerto Rico, a 30 de octubre de 2007

Panel integrado por su Presidenta, la Juez Ortíz Carrión, y las Juezas Feliciano Acevedo y Fraticelli Torres

Fraticelli Torres, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Esta sentencia resuelve las controversias planteadas en los dos recursos de autos, presentados separadamente contra la sentencia del Tribunal de Primera Instancia, Sala de Carolina, que declaró con lugar la reclamación que el señor Ángel Pérez Díaz, su esposa Elba R. Correa Santiago y la sociedad legal de gananciales de ambos presentaron contra Merck, Sharp & Dohme (I.A.) Corp. por despido injustificado y daños y perjuicios.

En el recurso KLAN-2006-00873, Merck impugna el dictamen que la condenó a pagar al señor Pérez los salarios dejados de percibir desde la fecha del alegado despido injustificado hasta la fecha en que se dictó la sentencia, más $10,000 de indemnización por los daños y angustias mentales sufridos, $5,000 por los daños y angustias mentales que la actuación de Merck le ocasionó a la señora Correa y $2,000 para el pago de honorarios de abogado.

Merck señala que el tribunal apelado incurrió en los siguientes errores: (1) al utilizar inadecuadamente un proyecto de sentencia; (2) al apreciar la prueba presentada; (3) al determinar que el despido del señor Pérez fue injustificado; (4) al determinar que el señor Pérez tenía una causa de acción bajo el Artículo 5-A de la Ley de Compensaciones por Accidentes del Trabajo; (5) al no descontar de la indemnización por salarios dejados de percibir la pensión de Merck y la pensión de la Administración del Seguro Social que recibe el señor Pérez; (6) al conceder indemnización por daños a la señora Correa a pesar de que su reclamación estaba prescrita; (7) al no reconocer que el señor Pérez no mitigó sus daños; y (8) al no delimitar el período de tiempo a base del cual se computará la partida por salarios dejados de percibir, toda vez que el foro de primera instancia no consideró que el señor Pérez se había acogido al retiro y que la sentencia se emitió el 14 de octubre de 2005, pero se redujo a escrito el 5 de abril de 2006.

En el recurso KLAN-2006-00910, el señor Ángel Pérez Díaz y los otros apelantes impugnan la cuantía fijada como honorarios, por considerarla excesivamente baja. Plantean que el Tribunal de Primera Instancia erró al conceder $2,000 para el pago de honorarios de abogados y no el *"25% según establecido en la Ley y la jurisprudencia aplicable"*.

Atendidos los planteamientos de ambas partes, por los fundamentos que se exponen a continuación, resolvemos modificar la sentencia apelada. Atenderemos primero el recurso KLAN-2006-00873 porque cuestiona la adjudicación de las reclamaciones medulares del pleito.

## I

El señor Pérez Díaz trabajó ininterrumpidamente durante 34 años para la compañía farmacéutica Merck. Inició sus labores como conserje hasta ocupar el puesto de Supervisor de Facilidades y Flota, cargo que ocupaba cuando fue despedido el 13 de septiembre de 2001. Como consecuencia del despido, el 4 de marzo de 2003, el señor Pérez, su esposa y la sociedad legal de gananciales de ambos presentaron una querella judicial por despido injustificado, reclamación de salarios, discrimen por edad y daños y perjuicios, al amparo de la Ley Núm. 80 del 30 de mayo de 1976, según enmendada, 29 L.P.R.A. sec. 185a *et seq*; el Artículo 5-A de la Ley del Sistema de Compensaciones por Accidentes del Trabajo, Ley 45 del 18 de abril de 1935, según enmendada, 11 L.P.R.A. 1, 7; la Ley Núm. 100 de 30 de junio de 1959, 29 L.P.R.A. sec. 196 *et seq.*, y el Artículo 1802 del Código Civil, 31 L.P.R.A sec. 5141. Se acogieron al procedimiento sumario que autoriza la Ley 2 de 17 de octubre de 1961, 32 L.P.R.A. secs. 3118-3113.

Los apelados alegaron que Merck despidió al señor Pérez de forma injustificada y discriminatoria a pesar de su dedicación en el desempeño de sus funciones; que nunca recibió una reprimenda del patrono y que, por el contrario, recibió varios reconocimientos por su excelente labor en la compañía; que fue sustituido por una persona mucho más joven que él, con menos experiencia en el tipo de trabajo que realizaba y de menor antigüedad en la compañía; y que, al momento del despido, el señor Pérez estaba recibiendo tratamiento médico en la Corporación del Fondo del Seguro del Estado y no habían transcurrido los 12 meses que constituyen el plazo de reserva de empleo al obrero incapacitado. También alegaron que esas actuaciones de Merck le ocasionaron al señor Pérez ciertas condiciones físicas y angustias mentales que lo han sumido en un estado de depresión y que lo han incapacitado para trabajar.

El señor Pérez y su esposa también reclamaron una indemnización por daños, porque Merck retiró arbitraria y negligentemente $3,035.12 de la cuenta bancaria del señor Pérez y su esposa, que correspondían al depósito directo del salario devengado en sus últimas semanas de trabajo. Esto causó que ellos se atrasaran en el pago de sus obligaciones, porque sus acreedores les devolvieron los cheques que emitieron contra esos dineros, por insuficiencia de fondos. Esta situación ocasionó que ellos se vieran expuestos a "*la humillación y al escarnio público*", lo que les provocó graves sufrimientos y angustias mentales.

En su contestación a la demanda, Merck alegó afirmativamente que, como resultado de una investigación interna, descubrió ciertas irregularidades en la obtención de las cotizaciones necesarias para la aprobación de los proyectos de construcción de las instalaciones de la compañía, específicamente que las cotizaciones provenían de una misma compañía o de compañías inexistentes. Como Supervisor de Facilidades y Flota, el querellante tenía a su cargo el requerimiento de las cotizaciones, pero el señor Pérez nunca explicó las irregularidades descubiertas, a pesar de que se le brindó la oportunidad de hacerlo, lo que puso de manifiesto su incumplimiento con la normas y políticas de la compañía y su negligencia e ineficiencia en el desempeño de sus funciones. A base de estas afirmaciones, el despido del señor Pérez fue motivado por razones legítimas del negocio, dirigidas a procurar el buen y normal funcionamiento de la empresa, y no por razón de su edad, por lo que no tenía una causa de acción por despido injustificado bajo la Ley 80 ni bajo la Ley 100. Merck también planteó que tampoco se cumplían los elementos necesarios para configurar una causa de acción al amparo del Artículo 5-A de la Ley de Compensaciones por Accidentes del Trabajo y que la reclamación estaba prescrita en todo o en parte.

Respecto a los daños reclamados, Merck afirmó que no le adeudaba cantidad alguna al señor Pérez y argumentó que, en todo caso, la Ley 80 dispone que la mesada es el único remedio al que tiene derecho el empleado despedido sin justa causa. Alegó, en la alternativa, que los daños, si alguno, fueron causados por las acciones u omisiones del propio demandante y que son exagerados y especulativos.

Posteriormente, Merck solicitó que la querella se atendiera bajo el procedimiento ordinario, a lo que el foro de primera instancia accedió. El juicio tuvo una duración de tres días. De conformidad con la prueba testimonial y documental presentada y admitida, ▆ el Tribunal determinó como probados los siguientes hechos:

El señor Pérez trabajó durante 34 años en Merck hasta que fue despedido el 13 de septiembre de 2001 a la edad de 61 años. Al momento del despido se desempeñaba como Supervisor de Facilidades y Flota, puesto por el que devengaba un salario mensual de $4,826, un bono anual de $5,000 y un "*discretionary award*" de $1,610, y cotizaba para el plan de retiro de la empresa. Recibía, además, plan médico para él y su esposa, y otros beneficios marginales que incluían "*stocks options*", lo que le permitía adquirir acciones de la empresa a un precio preferente.

Como parte de sus funciones, el señor Pérez tenía a su cargo solicitar tres cotizaciones escritas, según requerido por la política de la empresa para autorizar proyectos de construcción cuyos costos estimados excedieran de $1,500, tarea para la cual siempre tuvo discreción, pues no existía una lista o registro

preestablecido de las compañías o personas naturales que podían licitar. Las cotizaciones se unían al "*capital*", documento mediante el cual se autorizaba el desembolso del dinero necesario para la obra, el cual era revisado por la supervisora del señor Pérez y autorizado finalmente por la directora de finanzas y por el gerente general de Merck, por lo que el señor Pérez no tomaba la decisión final respecto a quién se le adjudicaba el proyecto de construcción.

De ordinario, el licitador seleccionado tenía que esperar a la orden de compra para enterarse de la adjudicación a su favor, aunque en algunas ocasiones el señor Pérez le informaba directamente de la elección. El señor Pérez intervino en alrededor de 30 o 40 proyectos de construcción sin que se le notificara deficiencia alguna en la ejecución de sus funciones. Para junio de 2001, mientras se recopilaba información sobre los contratistas y suplidores que ofrecían servicios a Merck, la empresa descubrió algunas irregularidades en el trabajo del señor Pérez. De acuerdo con Astrid Navarro, entonces Directora de Finanzas de Merck, las irregularidades consistían en la contratación frecuente de EG Construction para los proyectos de "*capital*" y la alegada inexistencia de algunos de los suplidores.

Cuando comenzó la investigación contra el señor Pérez, sus superiores le requirieron que agotara sus vacaciones. Astrid Navarro preparó dos memorandos internos sobre las alegadas deficiencias en el trabajo del señor Pérez, el primero fechado el 20 de junio de 2001 y el segundo el 12 de julio de 2001. Del segundo memorando se desprende que, para esa fecha, ya Merck consideraba despedir al señor Pérez, aun cuando no lo habían confrontado con las irregularidades descubiertas.

El 31 de agosto de 2001, Mónica Díaz, Directora de Recursos Humanos de Merck en ese momento, y Astrid Navarro, se reunieron con el señor Pérez para hablar sobre las alegadas irregularidades y sobre la existencia de los licitadores Piraña Const. y A. G. González. El señor Pérez les manifestó su disponibilidad para aclarar cualquier malentendido y ofreció una explicación respecto a los licitadores por los cuales fue cuestionado. Media hora después de terminada la reunión, la señoras Díaz y Navarro acudieron la oficina del señor Pérez y le solicitaron que entregara su tarjeta de identificación como empleado y las llaves que daban acceso a las facilidades de la empresa. Le indicaron, además, que se fuera a su casa, porque estaba bajo investigación, y que se presentara el martes siguiente en la Oficina de Recursos Humanos. Para ese entonces ni la señora Navarro ni la señora Díaz eran las supervisoras inmediatas del apelado.

Como consecuencia de la actitud asumida por las oficiales de Merck, el señor Pérez se puso nervioso, al extremo de que su presión arterial se elevó, por lo que al día siguiente acudió a un médico, quien lo refirió a la Corporación del Fondo del Seguro del Estado, por tratarse de un asunto ocupacional. El martes 4 de septiembre de 2001, luego de evaluar su caso, el Fondo determinó que el señor Pérez debía recibir tratamiento médico en descanso. Ese mismo día, el señor Pérez acudió a la reunión pautada con la señora Díaz y la señora Navarro en la cual le informaron que se estaba llevando a cabo un proceso de investigación en su contra. El señor Pérez les indicó su disponibilidad para colaborar con la investigación y les informó de la determinación del Fondo.

El 13 de septiembre de 2001, el señor Pérez se reunió nuevamente con las oficiales de Merck. En la reunión no se le proveyó por escrito el resultado de la investigación efectuada ni se le indicó en qué consistían las supuestas violaciones al reglamento de personal o cuáles eran las normas de la empresa que había incumplido. La señora Díaz trató de convencerlo para que renunciara, a lo que él se negó, y rechazó una vez más haber incurrido en alguna falta en el desempeño de su trabajo.

El 19 de septiembre de 2001, mediante carta suscrita por la señora Navarro, Merck le notificó al señor Pérez el despido, efectivo el 13 de septiembre de 2001. En la carta se le informó sin mayor explicación que el despido respondía a las conclusiones de la investigación. ■

La señora Díaz testificó que las razones para despedir al señor Pérez fueron las alegadas irregularidades en

las cotizaciones y admitió que, desde un principio, la medida disciplinaria considerada por la empresa fue el despido. Al despedirlo, Merck no consideró los 34 años de servicio ni el historial laboral del señor Pérez. La señora Díaz explicó que Merck nunca investigó la comisión de fraude por parte del señor Pérez y que utilizaban la palabra fraudulento para referirse a información que según ellos no era veraz.

Del testimonio del señor Carlos Torres, Coordinador de Servicios de Seguridad de la PRTC, no se pudo establecer que el número de teléfono que se le imputaba a Edwin Guzmán efectivamente le correspondiese. El señor Guzmán negó que beneficiara económicamente al señor Pérez e indicó que realizó varios trabajos para Merck, por lo que en algunas ocasiones se enteraba allí mismo de los proyectos disponibles para cotizar. Admitió que algunos de los números de teléfonos que aparecían en varias de las cotizaciones pertenecían a su esposa y a su suegro, quien también se dedicaba a la construcción; no obstante, de la prueba presentada surgió que Merck no tenía una política contra el nepotismo en los puestos de trabajo o en la contratación de servicios.

La señora Correa testificó que lo más impactante para ella y su esposo fue el desconocimiento de las razones para el despido, porque a su esposo nunca le informaron de problema alguno relacionado con su trabajo; que Merck era parte de sus vidas; y que lo acontecido ocasionó graves problemas económicos y emocionales a toda la familia. La prueba pericial fue consistente al establecer que el despido, y particularmente el hecho de que se pusiera en tela de juicio su integridad, constituyó un factor detonante o estresor que le causó una severa depresión con síntomas de ansiedad al señor Pérez.

Además de perder los beneficios de retiro, los que hubieran incrementado considerablemente si el señor Pérez no hubiese sido despedido, y los "*stocks options*", Merck canceló un depósito de $3,035.12 que hizo en la cuenta del apelado como pago por los salarios devengados durante las semanas anteriores al despido.

A base de esas determinaciones de hechos, el Tribunal de Primera Instancia concluyó que el despido del señor Pérez fue injustificado por dos razones. En primer lugar, concluyó que Merck le notificó al señor Pérez de la investigación luego concluir la misma, por lo que no se le brindó una oportunidad adecuada para defenderse; que Merck no sufrió pérdida económica por los actos imputados y que los trabajos facturados se realizaron a su satisfacción; que la conducta del señor Pérez no reveló un patrón de conducta impropia o inadecuada, ni sus actos fueron de tal seriedad o naturaleza que reflejaran una actitud o carácter lesivo a la paz o al buen orden de la empresa; y que, de haber ocurrido la conducta negligente atribuida, el Manual de Normas y Procedimientos Internos de la empresa establece la amonestación escrita como primera sanción y no el despido, por lo que Merck incumplió con el principio de disciplina progresiva dispuesto por la Ley 80 y con sus propias normas internas.

En segundo lugar, el foro de primera instancia concluyó que el señor Pérez fue despedido sin justa causa mientras recibía tratamiento en descanso por el Fondo y durante el período de reserva que establece la Ley de Compensaciones por Accidentes del Trabajo, por lo que resolvió que era acreedor de los remedios que establece el Artículo 5-A de la referida pieza legislativa, los cuales son mayores que los dispuestos por la Ley 80.

El foro sentenciador concluyó, además, que Merck retiró ilegalmente el dinero depositado en la cuenta bancaria del señor Pérez para el pago de los salarios devengados antes del despido, lo que acarrea una indemnización. No obstante, desestimó la causa de acción por discrimen por edad.

Examinemos las normas aplicables a las distintas controversias que han planteado los apelantes en sus respectivos recursos ante nos.

## II

Comencemos por atender el segundo señalamiento de error de Merck, en el que argumenta que el foro apelado incidió al apreciar la prueba testifical y documental presentada. Sobre este asunto, la Regla 43.2 de

Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 43.2, expresamente dispone que las determinaciones de hechos del foro apelado, sobre todo, las que se fundamentan en el testimonio oral, se respetarán por el tribunal apelativo, a menos que sean claramente erróneas o cuando el foro primario haya actuado con pasión, prejuicio o parcialidad, o incurra en un error manifiesto al aquilatarla. A base de esta norma, los foros apelativos suelen no intervenir ni alterar innecesariamente las determinaciones de hechos que formulan los Tribunales de Primera Instancia luego de admitir y aquilatar la prueba que se presenta en el juicio. Véanse, *Meléndez v. Caribbean Int'l News*, 151 D.P.R. 649, 664 (2000); *Quiñones López v. Manzano Pozas*, 141 D.P.R. 139, 152 (1996).

Esta deferencia hacia el foro primario responde al hecho de que el juez sentenciador es el que tiene la oportunidad de recibir y apreciar toda la prueba oral presentada, de escuchar la declaración de los testigos y evaluar su *demeanor* y confiabilidad. Por esto le compete al foro apelado o recurrido la tarea de dirimir los conflictos de la prueba testifical que ofrecen las partes y evaluar su credibilidad. *Ramos Acosta v. Caparra Dairy, Inc.*, 113 D.P.R. 357, 365 (1982); y *Sepúlveda v. Depto. de Salud*, 145 D.P.R. 560, 573 (1998).

Se exceptúan de la regla de deferencia las determinaciones de hechos que se apoyan exclusivamente en la prueba documental o pericial, porque los tribunales apelativos están en idéntica posición que el tribunal inferior al examinar ese tipo de prueba. *Sepúlveda v. Depto. de Salud*, 145 D.P.R., a la pág. 573 n.13 (1998); *Díaz García v. Aponte Aponte*, 125 D.P.R. 1, 13-14 (1989).

En síntesis, en el caso de autos, las determinaciones de hecho cuestionadas por Merck giran en torno a dos asuntos: (A) las funciones delegadas al señor Pérez, particularmente su responsabilidad en el proceso de obtención de las cotizaciones, la investigación realizada y las normas de conducta adoptadas por la empresa; y (B) la pérdida de los beneficios de retiro y la cancelación del pago por salarios devengados.

### A

Merck cuestiona la determinación del tribunal apelado referente a que el señor Pérez no tomaba la decisión final respecto a quién se le adjudicaba el proyecto de construcción; que no se le confrontó con dos memos con fecha del 21 de junio de 2005 y del 12 de julio de 2005 sobre las deficiencias encontradas; y que pudo explicar los cuestionamientos que se le hicieron sobre la investigación.

Un examen ponderado de la transcripción de la prueba oral refleja que el señor Pérez admitió que, si bien era cierto que la decisión final sobre la adjudicación de los proyectos de construcción recaía en oficiales de Merck de mayor jerarquía, era él quien de ordinario contactaba a los contratistas y recibía las cotizaciones, además de evaluarlas y recomendar la mejor opción. (T.P.O. de la vista del 21 de junio de 2005, a las páginas 121- 123, 128.) A preguntas de la representación legal de Merck sobre las cotizaciones investigadas, el señor Pérez no pudo explicar algunas de las irregularidades señaladas e indicó que, de haberse percatado, no hubiera considerado esas cotizaciones, por ser ello contrario a la política de compras de la empresa. (T.P.O. de la vista del 21 de junio de 2005, a las páginas 142-144, 160, 162-167.)

Del testimonio del señor Pérez también surge que, previo al despido, la señora Mónica Díaz y la señora Astrid Navarro se reunieron con él en tres ocasiones para discutir los hallazgos de la investigación y darle la oportunidad de ofrecer una explicación. (T.P.O. de la vista del 21 de junio de 200, a las páginas 62-65, 157-158.) Al examinar los memos a los cuales hace referencia el tribunal apelado, los que obran en el expediente, nos percatamos de que la información consignada en ellos, que consiste de un resumen de las gestiones hechas para localizar a los contratistas, fue divulgada verbalmente al señor Pérez durante las aludidas reuniones. (Apéndice de la parte apelante Merck, a las páginas 396-400.) Siendo así, erró el foro apelado al determinar que el señor Pérez no fue confrontado con los hallazgos realizados y que pudo ofrecer una explicación a los mismos.

Por otra parte, Merck argumenta que el foro de primera instancia también incidió al apreciar la prueba presentada, pues ésta demostró que el señor Pérez *"faltó a la verdad al representarle a la empresa que había*

*recomendado al mejor licitador luego de evaluar cotizaciones bona fide cuando hizo todo lo contrario y aceptó cotizaciones fraudulentas sin cotejar si provenían de compañías existentes y distintas. "*

Cabe señalar que la Regla 10 de Evidencia, en su inciso (d), 32 L.P.R.A., Ap. IV, R. 10, dispone que *"[l]a evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que por ley otra cosa se disponga".* Al aplicar esta regla, el Tribunal Supremo reiteradamente ha reconocido que basta el testimonio de un sólo testigo con conocimiento personal de la materia objeto del litigio, que le merezca credibilidad al tribunal, para establecer cualquier hecho. *Miranda Soto v. Mena Eró,* 109 D.P.R. 473, 481-482 (1980); *Pérez v. Acevedo Quiñones,* 100 D.P.R. 894, 899 (1972).

Hemos revisado cuidadosamente la transcripción de la prueba oral y de la misma no surge que Merck haya probado que el señor Pérez efectivamente tenía conocimiento de que la información provista en las cotizaciones no fuera veraz, o que, a sabiendas de ello, las utilizó para beneficiar a algún licitador en particular. De hecho, como mencionamos antes, el señor Pérez testificó que, de haber detectado alguna irregularidad en las cotizaciones, las hubiera descartado. Ningún testigo lo asoció con conducta moralmente reprobable o el recibo de gajes o provechos por ese tipo de gestión. La determinación del juzgador de hechos de que el apelado desconocía las irregularidades señaladas nos merece entera deferencia, pues no es manifiestamente errónea. No hemos de sustituir el criterio judicial vertido en la sentencia por el nuestro sobre este particular.

Finalmente, Merck plantea que el tribunal *a quo* erró al ignorar el testimonio de la señora Mónica Díaz quien declaró que, aun cuando la conducta en que incurrió el señor Pérez no está expresamente proscrita en el Reglamento de Trabajo, la misma era similar a otras faltas contempladas en el reglamento que acarrean el despido como primera sanción.

Al revisar el Reglamento de Trabajo de Merck constatamos que las faltas a las que hizo alusión la señora Díaz —proveer información falsa en reportes de visitas médicas y en documentos de reembolso de gastos así como hacer declaraciones falsas en documentos relacionados con la obtención de empleo—, requieren que la persona provea la información **con conocimiento de su falsedad**. (Apéndice de la parte apelante Merck, a la página 175.)

El tribunal apelado no dio por probado este hecho en el caso del señor Pérez. De un análisis minucioso de toda la prueba admitida en el caso, tanto testifical como documental, hemos podido corroborar que Merck no demostró en el juicio que tal supuesto de aplicación que justificaba la sanción mayor del despido, aún frente a una primera falta. No erró el tribunal *a quo* al concluir que, al no probarse ese criterio, el despido del señor Pérez no fue justificado.

**B**

Analicemos el planteamiento relativo a la concesión de los beneficios de retiro y a la cancelación del pago por salarios devengados.

El foro apelado determinó que el señor Pérez perdió sus beneficios de retiro y los denominados *"stock options"* por razón del despido injustificado. De la prueba presentada surge que efectivamente el despido acarreó la pérdida de ciertos beneficios económicos, particularmente los *"stock options"*, según lo admitió la señora Mónica Díaz en su testimonio. (T.P.O. de la vista de 22 de junio de 2005, a las páginas 105, 110.) También perdió el beneficio a recibir un plan médico de por vida para él y su esposa. (T.P.O. de la vista del 21 de junio de 2005, a la página 110.)

Ahora bien, una lectura de la transcripción de la prueba oral refleja que el señor Pérez admitió que comenzó a recibir la pensión de retiro de Merck al cumplir los 62 años de edad, tal como lo tenía planificado y manifestó en repetidas ocasiones. ■ (T.P.O. de la vista del 21 de junio de 2005, a las páginas 109, 110.) La Dra. Costas

también hizo alusión a este hecho en su informe pericial preparado con la información que le proveyó el señor Pérez. (Apéndice de la parte apelante Merck, a la página 252).

A base de la prueba recibida, no incidió el foro sentenciador al determinar que el señor Pérez sufrió la pérdida de los beneficios de *"stock options"* y plan médico como consecuencia de la terminación forzada de su empleo.

No obstante, erró el foro apelado al determinar que el despido injustificado produjo otras consecuencias económicas que se extienden desde el día del despido hasta la fecha en que se dictó la sentencia, obviando el hecho de que el señor Pérez se acogió al retiro de la compañía, como había manifestado y planificado antes del incidente del despido, por lo que, a partir del momento en que solicitó y Merck le concedió la pensión, sólo puede reclamar, como empleado retirado, que se le reconozcan todos los derechos y privilegios que surgen de esa situación. Lo demás sería especular que, llegado el día del retiro, el señor Pérez, contrario a lo expresado, hubiera decidido quedarse en la compañía luego de cumplir sus 62 años. Ampliamos este análisis en la parte IV de esta sentencia.

En lo que concierne a la alegación de los daños sufridos por causa de la cancelación del pago por los salarios devengados, Merck argumenta que el señor Pérez no estableció que la empresa fue quien debitó o extrajo ese dinero de su cuenta. Sin embargo, de la transcripción de la prueba oral se desprende que este hecho fue estipulado por Merck en la vista, cuando a preguntas de la jueza que presidió los procedimientos, su representación legal contestó como sigue sobre ese particular: ■

*"[...]*

*Lcdo. Shuster: (...) Nosotros no tenemos objeción a que esto se produzca como un exhibit, nosotros esperamos que la Compañera tenga evidencia...*

*Hon. Juez: ¿A los únicos efectos de establecer que el caballero tenía una cuenta de banco?*

*Lcdo. Shuster: No. O sea, nosotros sabemos que hubo una situación con un cheque al final, que él explicará...*

*[...]*

*Hon. Juez: Y estamos estableciendo que fueron... que hubo alguna dificultad con el pago.*

*Lcdo. Shuster: Lo que ocurre es que aparentemente es un depósito directo **y se le dieron unas instrucciones al banco de que retirara la mitad de las (ininteligible)***

*Hon. Juez: Por eso. **Que hubo una dificultad, sin entrar en el detalle de cuál fue, y afectó eso la liquidez de la cuenta de acá, Y eso es lo que se está demostrando con esto...***

*Lcdo. Shuster: **Exacto."***

Énfasis nuestro. T.P.O. de la vista de 21 de junio de 2005, págs. 95, 97, 98.

No se cometió el error señalado con relación a este asunto.

Finalmente, Merck señala que incidió el foro apelado al determinar que al momento de su despido el salario devengado por el señor Pérez incluia un *"discretionary award"* de $1,610, pues no se presentó prueba sobre el monto del premio al que tenía derecho el apelado.

Al examinar el testimonio del señor Pérez, surge que el "*discretionary award*" es un premio consistente en acciones de la empresa que reciben los empleados en atención a su desempeño, del que él fue merecedor durante sus últimos años de trabajo. (T.P.O. de la vista del 21 de junio de 2005, a las páginas 58, 104.) No surge de su testimonio cuál es la cantidad a la que ascendería ese premio, qué condiciones o criterios objetivos y subjetivos debían cumplirse para merecerlo, como tampoco si era una prerrogativa de la empresa darlo a algunos empleados con exclusión de otros. Ante la ausencia de prueba sobre los criterios objetivos y subjetivos que hacían al señor Pérez acreedor de ese beneficio, así como de la cuantía que hubiera recibido, no podemos avalar la determinación del foro sentenciador sobre este hecho particular.

## III

En sus señalamientos de error tercero y cuarto, Merck argumenta que incidió el foro apelado al concluir que el despido del señor Pérez fue injustificado a la luz de lo dispuesto en la Ley de Compensación por Accidentes del Trabajo y en la Ley 80, ya citadas. Veamos.

## A

La Ley de Compensaciones por Accidentes del Trabajo, según enmendada, es un estatuto con fines reparadores que establece un sistema de seguro compulsorio y exclusivo para compensar a los obreros y empleados que sufran lesiones, se inutilicen o mueran **como consecuencia de accidentes ocurridos en sus trabajos**. El Artículo 5-A de dicha ley, 11 L.P.R.A. sec. 7, garantiza al obrero que se inhabilita temporalmente, como consecuencia de un accidente o enfermedad ocupacional, cierta "*tranquilidad de espíritu*", en la medida en que le impone al patrono la obligación de reinstalarlo en su empleo, siempre que cumpla los requisitos que impone la propia Ley. ▮ *Rodríguez v. Méndez & Co.*, 147 D.P.R. 734, 745 (1999).

El Tribunal Supremo de Puerto Rico ha determinado que, a los fines de la Ley de Compensaciones por Accidentes del Trabajo, un accidente compensable es aquél que cumple con los siguientes requisitos: (a) que provenga de cualquier acto o función del obrero; (b) que sea inherente al trabajo o empleo del obrero; y (c) que ocurra en el curso de éste. *Lebrón Bonilla v. E.L.A.*, 155 D.P.R. 475, 484 (2001); *Ortiz Pérez v. F.S.E.*, 137 D.P.R. 367, 373 (1994); *Admor., F.S.E. v. Comisión Industrial*, 101 D.P.R. 56, 58 (1973).

En el caso de autos, los síntomas que motivaron al señor Pérez a buscar asistencia médica, y por los cuales recibió tratamiento en el Fondo, no fueron causados por la ejecución de algún acto o función inherente a su trabajo en Merck. Surgieron como consecuencia de lo discutido en la reunión que él sostuvo con las señoras Díaz y Navarro el 31 de agosto de 2001, para discutir las irregularidades aludidas. Su condición surgió luego de que se sintió despedido. ▮

De hecho, de la transcripción de la prueba oral surge que el señor Pérez admitió que el Fondo no relacionó su caso con su trabajo en Merck. (T.P.O. a la página 187). Asimismo, el Dr. Villanueva concluyó en su informe pericial que, según el expediente del Fondo que revisó, el señor Pérez fue dado de alta el 22 de mayo de 2002 sin que se relacionaran los síntomas por los cuales recibió tratamiento con sus funciones en la empresa. (Véase Apéndice de la parte apelante Merck, a las páginas 407, 408.) ▮ No surge del expediente ante nos que el señor Pérez haya instado recurso alguno contra esa determinación del Fondo.

Lo cierto es que estamos ante un empleado que fue despedido y que acude a un médico privado a recibir asistencia, sin que éste conozca la causa de su aflicción. El referido al Fondo concluyó en un eventual rechazo a la condición de depresión que sufría como accidente laboral o con causa relacionada al empleo, el que ya había perdido por razón del despido.

En tales circunstancias, en el caso de autos no estamos ante la ocurrencia de un accidente compensable, requisito de umbral para establecer una causa de acción al amparo de la Ley de Compensaciones por Accidentes del Trabajo, por lo que el foro de primera instancia incidió al concluir que el señor Pérez era acreedor de las

protecciones que otorga el Artículo 5-A de la mencionada ley al obrero lesionado.

## B

Descartada la aplicación de la Ley de Compensaciones por Accidentes del Trabajo al caso de autos, veamos si se sostiene la reclamación por despido injustificado al amparo de la Ley 80.

Como se sabe, existe un interés apremiante del Estado en regular las relaciones obrero-patronales, enmarcado ese interés en una política pública dirigida a proteger los derechos de los trabajadores. *Rivera v. Pan Pepín*, res. el 21 de abril de 2004, 161 D.P.R. __; **2004 J.T.S. 68**, 947; *Díaz v. Wynham Hotel Corp.*, 155 D.P.R. 364, 374 (2001). Con esta finalidad en mente, se adoptó la Ley 80, cuyo objetivo es dar mayor protección a los trabajadores ante el despido injustificado, al hacer más restrictivo el concepto de justa causa y al establecer una indemnización progresiva que les permita enfrentar temporalmente su situación laboral y económica inesperada, luego del paro laboral. *Srio. del Trabajo v. I.T.T.*, 108 D.P.R. 536, 540-541 (1979). En vista de su propósito reparador, la Ley 80 debe siempre interpretarse de manera liberal y favorable al empleado. *Jusino et al., v. Walgreens*, 155 D.P.R. 560, 571 (2001).

De conformidad con lo anterior, el Artículo 2 de la misma ley establece el estándar de *"justa causa"* como limitación a toda acción de despido por parte del patrono. Así, el referido artículo dispone que se entenderá como justa causa, entre otras situaciones, la *"violación reiterada por el empleado de las reglas y reglamentos razonables establecidas para el funcionamiento del establecimiento, siempre que copia escrita de los mismos se haya suministrado oportunamente al empleado"* 29 L.P.R.A. sec. 185b. No obstante, ese mismo artículo de la ley indica que *"no se considerará despido por justa causa aquél que se hace por mero capricho del patrono o sin razón relacionada con el buen y normal funcionamiento del establecimiento"*.

El Artículo 11 de esta ley presume, además, que el despido de un empleado es injustificado hasta que el patrono demuestre que tuvo justa causa para prescindir de sus servicios. 29 L.P.R.A. sec. 185k; *Rivera v. Pan Pepín*, **2004 J.T.S. 68**, a la pág. 947. Esto implica procesalmente que, aunque, de ordinario, es al *"reclamante al que le corresponde la obligación de probar con preponderancia de la prueba sus alegaciones para poder prevalecer en el pleito, [tal principio procesal] encuentra una excepción en los casos de la Ley 80"*. *Díaz v. Wyndham*, 155 D.P.R., a la págs. 378-379. Es decir, en un caso por despido injustificado, el patrono tiene el peso de la prueba para establecer que el despido estuvo justificado. *Rivera v. Pan Pepín*, **2004 J.T.S. 68**, a las págs. 947, 948.

El Tribunal Supremo ha señalado, sin embargo, que la Ley 80 no es un código de conducta que fija una lista de faltas definidas o taxativas. *Srio del Trabajo v. I.T.T.*, 108 D.P.R., a la pág. 542. El patrono podría adoptar las normas que entienda razonables y necesarias para que la empresa funcione correctamente. Ahora bien, una vez establecidas las normas de trabajo de la empresa, así como los beneficios y privilegios que disfrutará el empleado, éstos forman parte del contrato de trabajo, por lo que un despido en violación de esas normas, beneficios y privilegios, constituiría un despido injustificado. *Scrio. del Trabajo v. G.P. Inds., Inc.*, 153 D.P.R. 223, 245-246 (2002).

En el caso de autos, Merck plantea que el señor Pérez actuó **negligentemente** en el desempeño de sus funciones como Supervisor de Facilidades y Flota, lo que lo llevó a incumplir con la política de compras que regula la obtención de cotizaciones para proyectos de construcción. Este proceder justificó su despido, aunque fuera una primera sanción, pues los proyectos se otorgaron a base de información que no era veraz.

La dificultad con la contención de Merck es que, si examinamos su Reglamento de Trabajo, observamos que la Sección C, inciso 2, expresamente dispone que el desempeño ineficiente, tardío o negligente del trabajo asignado acarrea la aplicación progresiva de medidas disciplinarias, es decir, una amonestación escrita, en el caso de una primera violación, una amonestación escrita y tres días de suspensión, en el caso de una segunda

violación, y el despido, en el caso de una tercera violación.

Al considerar la naturaleza de las imputaciones que fundamentaron la decisión de Merck de despedir al señor Pérez, es decir, el **manejo negligente de las cotizaciones**, tenemos que concluir que Merck actuó de manera contraria a lo dispuesto en su propio Reglamento de Trabajo, al imponer el despido como primera sanción ante un caso de negligencia en el manejo de información y toma de decisiones. ■

No obstante lo anterior, Merck argumenta en la alternativa que la aludida disposición reglamentaria no es óbice para imponer el despido como primera sanción, aun en casos de negligencia o cuando la infracción no esté específicamente proscrita. Arguye que el Reglamento de Trabajo también advierte que la empresa puede desviarse del curso disciplinario establecido cuando la seriedad de falta cometida lo amerite. Respecto a este planteamiento debemos apuntar que tal proceder por parte del patrono requiere la comisión de una *"falta cuya intensidad de agravio así lo requiera, para proteger el normal y buen funcionamiento de la empresa"* Scrio. del Trabajo v. G.P. Inds., Inc., 153 D.P.R., a la pág. 246.

Aunque somos concientes del interés de Merck de procurar que la adjudicación de los proyectos de construcción y remodelación de sus instalaciones se efectúe de conformidad con las políticas de compras establecidas, lo cierto es que las funciones del señor Pérez de solicitar y recibir cotizaciones no estaban estrechamente ligadas con el proceso de elaboración y distribución de los fármacos y artículos médicos que Merck produce, por lo que su negligente desempeño no pudo poner en riesgo la seguridad del negocio ni comprometer el buen funcionamiento de la empresa farmacéutica, al extremo de hacer necesario e imperioso su despido fulminante. Distinto sería el caso si con su proceder negligente el señor Pérez hubiera afectado la elaboración y calidad de los productos que Merck elabora y distribuye o, como consecuencia, hubiera creado un ambiente de trabajo inseguro para sus empleados o comprometido el bienestar de aquéllos que eventualmente adquirieran tales productos.

Nótese, además, que de la prueba presentada no se desprende que Merck sufrió pérdida económica sustancial alguna o que los proyectos adjudicados no se realizaron como acordado o que se ejecutaron defectuosamente.

Concluimos, por las circunstancias del caso de autos, que el despido del señor Pérez fue injustificado, a tenor de lo pautado en la Ley 80 y en la jurisprudencia que la interpreta. No cumplió Merck con el rigor de la disciplina progresiva. No incidió el foro sentenciador al así resolverlo.

## IV

Procede ahora expresarnos sobre los remedios a los que tiene derecho el señor Pérez por razón de su despido sin causa justificada.

## A

La Ley 80 adoptó un remedio de compensación económica a aquellos empleados que han sido despedidos sin justa causa. El Artículo 1 de esta ley dispone que todo empleado de comercio o industria con contrato de trabajo por tiempo indeterminado tiene derecho a recibir de su patrono el sueldo que ha devengado antes de su despido. Además de esta partida, el empleado tiene derecho a recibir una mesada especial, consistente en el salario correspondiente a un mes por concepto de indemnización básica y una indemnización progresiva adicional que equivale a una semana por cada año de servicio. 29 L.P.R.A. sec. 185a. Esta mesada constituye el único remedio al que tiene derecho el empleado así despedido y va dirigida a socorrerlo económicamente en la etapa de transición del empleo que ocupa al que pueda conseguir en un futuro o a la aprobación de otras vías de ingresos recurrentes. Véase a *Díaz v. Wyndham Hotel Corp.*, 155 D.P.R., a la pág. 375; *Delgado Zayas v. Hospital Interamericano*, 137 D.P.R. 643, 648-649 (1994).

Conforme a lo anterior, el señor Pérez tiene derecho a recibir la mesada correspondiente como **remedio exclusivo por haber sido despedido injustificadamente**, por lo que la indemnización por daños y perjuicios concedida al señor Pérez y a la señora Correa en virtud del Artículo 5-A de la Ley de Compensaciones por Accidentes del Trabajo o de cualquier otra fuente legal, **no procede**. Sobre este asunto incidió el Tribunal de Primera Instancia.

Además, **en atención a las circunstancias particulares del caso de autos**, debemos aclarar, como ya advertimos, que **el período que ha de tomarse en consideración para computar la cuantía de la mesada será el transcurrido desde la fecha del despido del señor Pérez hasta la fecha en que comenzó a recibir la pensión de Merck**. Esto es lo justo y apropiado legalmente, porque el señor Pérez admitió en el juicio que, antes de ser despedido, ya tenía planificado retirarse una vez cumpliera los 62 años y así lo hizo. A preguntas de la abogada de Merck, el señor Pérez testificó lo siguiente sobre este asunto:

*"P. Al momento de su despido usted contaba con 61 años.*

*R. Es correcto.*

*P. Y ya **usted había anunciado en la compañía que usted se iba a retirar en un año**, ¿correcto?*

*R. Sí. **Yo todo el tiempo lo tenía planificado así.***

*P. Exacto. El plan suyo era... cuando a usted lo despiden, **a usted le faltaba un año para retirarse**, ¿correcto?*

*R. Sí. **Es correcto**.*

*P. Y de hecho, ese año adicional le convenía a usted en términos económicos porque de la forma en que estaba estructurado el plan de pensión de la compañía le dan mayores beneficios a uno si se retira a los 35 años con 62 años, ¿correcto?*

*R. Es correcto.*

*P. Incluyendo beneficios de plan médico, ¿cierto? Por vida, me parece, ¿verdad?*

*R. Sí. Es correcto.*

*P. Y de hecho, **el año anterior a su terminación de empleo, usted había hecho gestiones, directamente usted y dos empleados más, con el gerente general de la compañía, el señor Simich, para ver si se podía abrir a una ventana de retiro temprano y poder irse un año antes**, ¿correcto?*

*R. **Es correcto**.*

*P. Bien. Y el señor Simich le dijo, "Vamos a ver, porque eso lo tiene que tramitar Estados Unidos, lo tiene que aprobar", y eventualmente no se aprobó esa ventana de retiro temprano, ¿cierto?*

*R. Es correcto."*

Énfasis nuestro. (T.P.O. de la vista del 21 de junio de 2005, a las páginas 109, 110.)

Al así resolver evitamos un enriquecimiento injusto por parte del señor Pérez, pues de otra manera se le estaría indemnizando con una mesada mayor por el período de tiempo durante el cual ha estado recibiendo su

pensión de retiro y por una expectativa de trabajo e ingresos que ya no tenía.

## B

En lo concerniente a la causa de acción incoada al amparo del Artículo 1802 del Código Civil, 31 L.P.R.A sec. 5141, nos percatamos de que, a pesar de que el foro apelado concluyó que Merck retiró ilegalmente el dinero depositado en la cuenta del señor Pérez, nada dispuso en cuanto al remedio correspondiente. Como se sabe, si el empleado puede demostrar que el patrono ha incurrido en una actuación torticera independiente al poner fin a su empleo, entonces tendrá derecho a aquellos otros remedios que le confieren las leyes. *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35, 65, (1986).

Sobre este particular, el Tribunal Supremo expresó que "*[l]a exclusividad de remedios de las leyes laborales no excluye la responsabilidad civil de un patrono por conducta torticera en que incurriere por otros motivos que no sean la mera violación de una disposición de las leyes del trabajo.*" *Soc. de Gananciales v. Royal Bank de P.R.*, 145 D.P.R. 178, 193 (1998). Véase, también, *Porto y Siurano v. Bentley P.R., Inc.*, 132 D. P.R. 331 (1992).

Para que prospere una reclamación por responsabilidad civil extracontractual es necesario que se produzca un acto o una omisión culposa o negligente, que ocasione un daño y que exista una relación causal entre la acción u omisión y el daño ocasionado. Artículo 1802 del Código Civil, 31 L.P.R.A. sec. 5141.

En el caso de autos, las partes estipularon que Merck solicitó el retiro del dinero depositado en la cuenta bancaria del apelado y que ese dinero era el salario devengado por él. Durante su testimonio, el señor Pérez declaró que esa acción de Merck ocasionó la devolución de los cheques emitidos para el pago de múltiples obligaciones. Expresó la angustia que esto le provocó al tener que pedir dinero prestado para atender sus obligaciones. (T.P.O. de la vista del 21 de junio de 2005, a las páginas 91-99.) En apoyo de su testimonio sometió la copia pertinente del estado de su cuenta en el banco Citibank y de los cheques devueltos por los acreedores.

Como es sabido, una vez se determina que existe responsabilidad de un sujeto por los daños ocasionados a otro, se le impone al primero el deber de resarcir el daño sufrido al perjudicado. Artículo 1802 del Código Civil, 31 L.P.R.A. sec. 5141. Esto se logra mediante la valoración económica del perjuicio en una cuantía suficiente para reparar o mitigar el bien o interés afectado. *Pagán v. Shiley Caribbean*, 122 D.P.R. 193, 205-206 (1988). El Tribunal de Primera Instancia no estimó el valor de ese daño. Incidió al no hacerlo.

Nos queda un último pronunciamiento sobre este asunto. El Artículo 1861 del Código Civil, 31 L.P.R.A. sec. 5298, establece el plazo prescriptivo de un año para incoar una reclamación por daños. Como se sabe, la prescripción es una defensa afirmativa que es renunciable si no se plantea oportunamente. En el caso de autos, aun cuando en su contestación a la querella Merck afirmó de forma general que la reclamación presentada estaba prescrita en todo o en parte, lo cierto es que Merck no puso en condiciones al tribunal para poder establecer una fecha cierta a partir de la cual computar el término prescriptivo aplicable a la reclamación por daños. Ello es así, pues no alegó en qué momento el señor Pérez advino en conocimiento del daño provocado por la devolución de los cheques y de que fue Merck quien retiró el dinero depositado. Concluimos que no se probó la prescripción aludida y que la reclamación fue oportuna.

Reiteradamente, el Tribunal Supremo de Puerto Rico ha resuelto que los tribunales deben conceder lo que en derecho proceda. *Soto López v. Colón*, 143 DPR 282 (1997). Así pues, por tratarse de una estimación avalada por prueba documental, estimamos los daños causados al señor Pérez y su esposa por el retiro ilegal de los fondos en $3,000, cantidad aproximada del peculio del que carecieron temporalmente al ocurrir la irregularidad bancaria inducida por Merck.

## C

Sabemos que *"[u]na sentencia es distinguible de las determinaciones de hechos y las conclusiones de derecho del tribunal, aun cuando estas últimas se incorporen en el mismo documento con la sentencia. [Citas omitidas.] Las determinaciones de hechos y conclusiones de derecho constituyen los fundamentos en que apoya el juez la sentencia que emite en el caso, [pero es] sólo la porción o parte dispositiva de la 'sentencia' la que constituye la sentencia; los derechos de las partes son adjudicados, no mediante la relación de los hechos, sino únicamente mediante la parte dispositiva de la misma. [Citas omitidas.] En otras palabras, es en la parte dispositiva de la sentencia donde se adjudican y determinan las controversias del caso y donde se definen los derechos de las partes."* [Citas omitidas.] *Cárdenas Maxán v. Rodríguez*, 119 D.P.R. 642, 655-657 (1987).

Notamos que, aunque en las conclusiones de derecho de la sentencia apelada se afirma que la esposa de un empleado tiene derecho a una indemnización por tal concepto, en la parte dispositiva de la sentencia se desestimó la causa de acción por discrimen que presentaron tanto el señor Pérez como su esposa en su carácter personal. Sin embargo, se dejó la cantidad de $5,000 como indemnización por ese concepto. Esta grave contradicción surge de la misma parte dispositiva. Siendo correcta la determinación de que no procedía la acción por discrimen, procede que se elimine esa partida. Creemos que sólo sobre este particular podemos admitir el señalamiento sobre el uso inadecuado de un proyecto de sentencia por la jueza que suscribió el dictamen. No es necesario discutir los demás apuntes hechos por la parte apelante sobre el tema, ante la atención que hemos dado a los demás señalamientos del recurso.

## V

Nos resta por considerar lo planteado en el recurso KLAN-2006-00910. El matrimonio Pérez Correa plantea que el foro de primera instancia debió conceder una partida de honorarios de abogado no menor al 25% de la indemnización otorgada, aun cuando la reclamación por discrimen por edad fue desestimada.

El Artículo 2 de la Ley de Reclamaciones Laborales, Ley Núm. 402 del 12 de mayo de 1950, dispone que *"[e]n todo caso radicado en los tribunales de Puerto Rico por un trabajador o empleado en que se reclame cualquier derecho o suma de dinero contra su patrono, al amparo de la legislación laboral federal o local o convenio y en que se conceda la reclamación en todo o en parte, se condenará al patrono al pago de honorarios."* 32 L.P.R.A. sec. 3114. Tal disposición, sin embargo, no da criterios para fijar una cuantía determinada ni sugiere un mínimo apropiado.

Por su parte, el Artículo 8(b) de la Ley 80, 29 L.P.R.A. sec. 185k (b), establece que la partida de honorarios de abogado que se conceda en los casos incoados por razón de despido injustificado no deberá ser menor del 15% del total de la indemnización que reciba el empleado. De ahí que no proceda la imposición automática del 25% propuesto como cantidad mínima para el pago de honorarios de abogado.

Reconocemos que la cuantía concedida en el caso de autos por concepto de honorarios de abogado es baja. Resolvemos que se conceda a los apelados, por tal concepto, el 15% de la cuantía que finalmente reciba el señor Pérez como mesada por el despido injustificado, luego que se determine cuál es esta cuantía, de conformidad con lo resuelto en esta sentencia.

## VI

Por los fundamentos expresados, se modifica la sentencia apelada en los términos siguientes: (1) eliminar la causa de acción al amparo de la Ley de Compensaciones por Accidentes del Trabajo y los remedios provistos a su amparo; (2) disponer que la mesada adeudada por Merck Sharp & Dohme (I.A.) Corp. al señor Ángel Pérez Díaz se computará desde la fecha de su despido hasta la fecha en que comenzó a recibir su pensión de retiro de esa empresa; (3) concederle al señor Pérez Díaz y a su esposa la cantidad de $3,000 como indemnización por los daños sufridos a raíz del retiro ilegal de sus fondos bancarios por parte de Merck, al amparo del artículo 1802 del Código Civil de Puerto Rico; (4) aclarar que no procede el pago de $5,000 por la acción de discrimen

a la señora Elba R. Correa Santiago; y (5) ordenar el pago de honorarios de abogado por una cuantía equivalente al 15% de la mesada que se pague al señor Pérez Díaz, de conformidad con lo resuelto en esta sentencia. Así modificada, se confirma la sentencia apelada.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones. La juez Feliciano Acevedo concurre con el resultado sin opinión escrita.

María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones